**FILED**
CLERK

3/1/2016 12:20 pm

**U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE**

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X
VIS VIRES GROUP, INC.,

                                                Plaintiff,


                        -against-                                          **MEMORANDUM OF
                                                                           DECISION & ORDER**
ENDONOVO THERAPEUTICS, INC. and                                            16-cv-470 (ADS)(AYS)
ALAN COLLIER

                                                Defendants.
-------------------------------------------------------------------X


**Naidich Wurman LLP**
*Attorneys for the Plaintiff*
111 Great Neck Road, Suite 214
Great Neck, NY 11021
            By: Richard S. Naidich, Esq.
                Bernard Samuel Feldman, Esq.
                Robert P. Johnson, Esq., Of Counsel


**Lindenbaum & Young, P.C.**
*Attorneys for the Defendants*
1164 Manhattan Avenue, Suite 100
Brooklyn, NY 11222
            By: Robert J. Young, Esq., Of Counsel

        This case arises from the refusal by the Defendants Endonovo Therapeutics, Inc. ("Endonovo")

and Alan Collier ("Collier" and collectively, the "Defendants") to comply with a request by the

Plaintiff Vis Vires Group, Inc. (the "Plaintiff") to convert $15,000 of the $66,000 in principal

remaining due under promissory notes issued by Endonovo to the Plaintiff into shares of Endonovo's

common stock.

        On January 29, 2016, the Plaintiff commenced this action by filing a complaint seeking

monetary damages in the amount of $132,000 as well as equitable relief in the form of a preliminary

and permanent injunction directing the Defendants and their agents to "immediately take all steps

necessary and proper to permit conversion of debt to stock and to deliver the stock at issue."

        Also on January 29, 2016, the Plaintiff filed, by order to show cause, a request for a temporary

restraining order ("TRO") and preliminary injunction directing the Defendants to comply with the

Plaintiff's notice of conversion.

On January 29, 2016, the Court denied the Plaintiff's motion for a TRO and requested oral argument and additional briefing regarding the Plaintiff's motion for a preliminary injunction.

On February 16, 2016, the Court heard oral argument on the Plaintiff's motion and granted the parties' requests for further briefing. The Plaintiff's motion for a preliminary injunction is now fully briefed.

For the reasons set forth below, the Court denies the Plaintiff's motion for a preliminary injunction

## I. BACKGROUND

The Plaintiff is engaged in the "business of investing in small capitalization companies which are generally traded on the 'over the counter market.'" (Kramer Aff. at ¶ 3.)

The Defendant Endonovo "develop[es] bioelectronics devices and therapies for regenerative medicine." (Collier Aff. at ¶ 4.)

The Plaintiff made three loans to the Defendants: (i) on June 9, 2015, the Plaintiff made a loan to the Defendants in the principal amount of $38,000; (ii) on July 9, 2015, the Plaintiff made a loan to the Defendants in the principal amount of $33,000; and (iii) on August 10, 2015, the Plaintiff made a loan to the Defendants in the principal amount of $33,000. (See Kramer Aff. at ¶ 10; Collier Aff. at ¶ 8.)

In connection with each loan, the parties executed a securities agreement and Endonovo issued a promissory note to the Defendants. In support of its present motion, the Plaintiff attaches a copy of a July 9, 2015 Securities Purchase Agreement entered into by the parties (the "July 2015 SPA") and a promissory note issued by the Defendants in favor of the Plaintiff, also dated July 9, 2015, which memorializes the terms of the second loan (the "July 2015 Note"). (See Kramer Aff., Exs. A, B.) The Plaintiff does not offer the loan documents memorializing the first and third loans. However, it states — and the Defendants do not appear to dispute — that the loan documents for the second and third

2

loans are "identical" with the exception of the effective dates of the loans and the "maturity dates" — namely, when the full principal amounts of the loans are due.  (See Kramer Aff. at ¶ 9.)

Under the terms of the July 2015 SPA, the Plaintiff agreed to pay Endonovo $33,000 in exchange for the issuance of a "8% convertible promissory note" on the part of Endonovo in the aggregate principal amount of $33,000, which was to be "convertible into shares of common stock, $0.0001 par value per share, of [Endonovo], upon the terms and subject to the limitations and conditions set forth in such Note."  (Kramer Aff., Ex. B, at Art. 1, at pp. 1, 20.)

In compliance with the terms of the SPA, Endonovo issued the July 2015 Note under which it promised to pay the Plaintiff the principal amount of $33,000, plus interest at a rate of 8% per year, by April 13, 2016, the maturity date of the Note.  (See Kramer Aff., Ex. A, at p. 1.)

Of importance, Article 1.1 of the July 2015 Note states:

The [Plaintiff] shall have the right from time to time, and at any time during the period beginning on the date which is one hundred (180) days following the date of this Note and ending on the later of:  (i) the Maturity date and (ii) the date of payment of the Default Amount (as defined in Article III) pursuant to Section 1.6(a) or Article III, each in respect of the remaining outstanding principal amount of this Note to convert all or any part of the outstanding and unpaid principal amount of this Note into fully paid and non-assessable shares of Common Stock exists on the Issue Date, or any shares of capital stock or other securities of [Endonovo] . . . determined as provided herein (a 'Conversion'); provided, however, that in no event shall the [Plaintiff] be entitled to convert . . . the number of shares of Common Stock . . . [which] would result in beneficial ownership by the [Plaintiff] and its affiliates of more than 9.99% of the outstanding shares of Common Stock.

(Id. at Art. 1.1, at p. 2.)

Further, Article 1.2 sets forth a formula for calculating the conversion price of the Common Stock which gives the Plaintiff a 42% discount on the present "Market Price" of the stock, defined as "the average of the lowest three (3) Trading Prices for the Common Stock" during the 15 trading days prior to the date of the Conversion.  (Id. at Art. 1.2(a), at p. 3.)

Under Article 1.4 of the July 2015 Note, once the Plaintiff provides Endonovo with a proper Notice of Conversion, Endonovo must "issue" or "cause to be issued" the appropriate amount of Common Stock to the Plaintiff within three business days after receiving the Notice of Conversion.

(Id. at Art. 1.4(d), at pp. 5–6.)  In this respect, "[Endonovo's] obligation to issue and deliver the certificates of Common Stock shall be absolute and unconditional[.]"  (Id. at Art. 1.4(e), at p. 6.)

In the event that Endonovo fails to issue the Common Stock to the Plaintiff within the three-day deadline, the Note provides that Endonovo must pay the Plaintiff "$2,000 per day in cash, for each day beyond the Deadline that the Borrower fails to deliver such Common Stock . . . , [which] shall be added to the principal amount of this Note, in which even interest shall accrue thereon in accordance with the terms of this Note." (Id. at Art. 1.4(e), at pp. 6–7.)

Further, Article III sets forth certain "events of default" under the Note, which include, (i) the failure by Endonovo to "issue shares of Common Stock to the [Plaintiff] . . . upon exercise by the [Plaintiff] of [its] conversion rights"; (ii) the failure by Endonovo to "transfer or cause its transfer agent to transfer (issue) . . . any certificate of shares of Common Stock issued to the [Plaintiff] upon conversion of . . . this Note"; and (iii) efforts by Endonovo to "direct[] its transfer agent not to transfer . . . . . any certificate for shares of Common Stock to be issued to the [Plaintiff] upon conversion . . . of this Note."  (Id. at Art. 3.2, p. 14–15.)  Upon the occurrence of a default of the above-provisions, "the Note shall become immediately due and payable and the borrower shall pay to the holder, in full satisfaction of its obligations hereunder, an amount equal to . . . the default sum . . . multiplied by 2." (Id. at Art. 3.16, at p. 17.)

Article III also specifies that Endonovo "defaults" under the Note if "[i]n the event that [Endonovo] proposes to replace its transfer agent, [Endonovo] fails to provide, prior to the effective date of such replacement, a fully executed Irrevocable Transfer Instructions [sic]."  (Id. at Art 3.15, at p. 16.)  If Endonovo defaults under this provision, the Note also "becomes immediately due and payable," and Endonovo must also make additional payments to the Plaintiff, including the "greater of . . . 150% times the sum of . . . the then outstanding principal amount of this Note plus . . . accrued and unpaid interest on the unpaid principal amount of this Note to the date of payment . . . or . . . the higher number of shares of Common Stock issuable upon conversion of to such Default Sum in accordance

with Article I . . . <u>multiplied by</u> . . . the highest Closing Price for the Common Stock during the period beginning on the date of first occurrence of the Event of Default[.]" (<u>Id.</u> at Art. 3.16, at p. 17) (emphasis in original).

Finally, under Article 4.10 of the Note, Endonovo "acknlowedg[ed] that the remedy at law for a breach of its obligations under this Note will be inadequate and agrees . . . that the [Plaintiff] will be entitled . . . to an injunction or injunctions restraining, preventing or curing any breach of this Note[.]" (<u>Id.</u> at Art. 4.10, at p. 21.)

On an unspecified date, the Defendants paid back the $38,000 in principal and interest due to the Plaintiff under the June 9, 2015 loan. (<u>See</u> Kramer Aff. at ¶ 11.)

On January 21, 2016, Judah Eisner, Esq. ("Eisner"), an attorney representing the Plaintiff, sent an email to Endonovo attaching a Notice of Conversion in connection with the July 2015 Note. (<u>See</u> Kramer Aff., Ex. G.) The Notice stated that the Plaintiff "hereby elects" to convert $15,000 of the $33,000 due under the July 2015 Note into 95,663 shares of common stock at the conversion price of $.1568 per share. (<u>Id.</u>) Following the conversion, $18,000 in principal would be left remaining due under the July 2015 Note. (<u>Id.</u>)

On January 25, 2016, the Defendant Collier sent an email to Seth Kramer, the Vice President of the Plaintiff ("Kramer"), in which he stated:

> This conversion create a usurious transaction. My company cannot be part of such a conspiracy against the shareholders and other debt holders of Endonovo and as such I have to deny your request.
>
> The highest rate for this type of transaction in the State of New York is 16% per annum. The amount of shares you requested in the conversion notice dated 1/21/16 far exceeds the allowable interest rate. 95,663 shares from $15,000 is $29,657, 197%!

(Collier Aff. at ¶ 7.)

Subsequently, in a January 25, 2016 letter to Collier, Bernard S. Feldman, Esq., another attorney representing the Plaintiff, denied that the July 2015 Note was usurious. (<u>See</u> Kramer Aff., Ex. H, at p. 1–2) In addition, Feldman noted, "[W]e understand that [Endonovo], upon your instruction,

replaced its transfer agent to Clear Trust LLC without the required executive Irrevocable Transfer Instructions . . . which is an Event of Default pursuant to Section 3.15 of the Note." (Id. at p. 2.) Accordingly, Feldman demanded, on behalf of the Plaintiff, that Endonovo (i) "immediately cause the Notice to be effective and the underlying shares of common stock of the Company issued to Vis Vires without any restrictive legend . . . ; and (ii) that you and Clear Trust LLC enter into an Irrevocable Transfer Agent Instructions which sets forth an appropriate share reserve pursuant to the terms of the Note." (Id.) Feldman further advised Collier that "in the absence of the issuance of the requisite shares, within three (3) business days of the date of the Notice, we have been instructed by [the Plaintiff] to commence litigation." (Id.)

Endonovo did not comply with the Plaintiff's request to convert $15,000 of its debt under the July 2015 Note into common stock.

As a result, and as noted previously, on January 29, 2016, the Plaintiff commenced this action by filing a complaint and a motion for a TRO and preliminary injunction (i) "[e]njoining and restraining the [D]efendants and their agents, servants and employees including but not limited to [the] [D]efendants' transfer agent, Clear Trust LLC, from interfering with, prejudicing, or impeding the efforts by [the] [P]laintiff to convert the debt that it holds as obligee against Endonovo Therapeutics, Inc. into stock of Endonovo Therapeutics, Inc."; (ii) "[d]irecting Endonovo Therapeutics, Inc. to execute such issuance resolutions or other documents as are required to effectuate the conversion process from debt to stock as referenced above"; (iii) "[d]irecting Endonovo Therapeutics, Inc. and its transfer agent Clear Trust LLC to issue the shares requested by [the] Plaintiff's January 21, 2016 Notice of Conversion and to expeditiously process all future Notices of Conversions submitted by Plaintiff and to issue the shares represented by such conversions"; and (iv) "[g]ranting the [P]laintiff such other and further relief as to the Court may seem just and proper." (See Proposed Order to Show Cause, Dkt. No. 3.).

# II. DISCUSSION

It is well-established that "[t]he District Court may grant a preliminary injunction if the moving party establishes '(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.'" Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc., 696 F.3d 206, 215 (2d Cir. 2012) (quoting UBS Fin. Servs., Inc. v. W. Va. Univ. Hosps., Inc., 660 F.3d 643, 648 (2d Cir. 2011)).

In the present case, the Plaintiff asserts that preliminary relief is warranted because (i) it is likely to succeed in its breach of contract and tortious interference claims against the Defendants; and (ii) it will suffer irreparable harm if preliminary relief is denied because it contends that Endonovo is on the brink of insolvency, and there is a distinct possibility that it will be unable to satisfy any monetary judgment if the Plaintiff succeeds at trial. (The Pl.'s Mem. of Law, Dkt. No. 4, at 6–10.)

In response, the Defendants assert that preliminary relief is not warranted because (i) the Court lacks subject matter jurisdiction over the Plaintiff's claims; (ii) the Defendants are not insolvent and therefore, the Plaintiff has failed to establish irreparable harm; (iii) the Plaintiff's state law claims are unlikely to succeed because the July 2015 SPA and Note are usurious, the outstanding loans have not yet become due, and Curt Kramer, the Plaintiff's president, entered into a settlement with the Securities and Exchange Commission ("SEC") in an unrelated matter. (The Defs.' Opp'n Mem. of Law, Dkt. No. 23, at 2–8.)

As set forth below, the Court finds that the Plaintiff has not adequately demonstrated subject matter jurisdiction and irreparable harm. Accordingly, the Court does not reach the parties' contentions with respect to the merits of the Plaintiff's claims.

The Court will address the jurisdictional issue and irreparable harm, in turn.

**A. As to Subject Matter Jurisdiction**

"A motion for a preliminary injunction under Rule 65(a), or for a temporary restraining order under Rule 65(b), does not confer subject matter jurisdiction on the court." Jones v. Cawley, No. 10-CV-712, 2010 WL 2545738, at *1 (N.D.N.Y. June 21, 2010) (citing Citizens Concerned for Separation of Church and State v. City and County of Denver, 628 F.2d 1289, 1298–99 (10th Cir. 1980)); see also Lathrop v. Unidentified, Wrecked & Abandoned Vessel, 817 F. Supp. 953, 961 (M.D. Fla. 1993) ("A federal court may issue an injunction if it has personal jurisdiction over the parties and subject matter jurisdiction over the claim.") (citing Zepeda v. United States I.N.S., 753 F.2d 719 (9th Cir.1983)).

Thus, "[a]s is true of civil actions generally, an independent basis for asserting federal question or diversity jurisdiction must be shown," in order for a court to grant preliminary relief. 11A Fed. Prac. & Proc. Civ. § 2941 (3d ed.); see also Park Place Entm't Corp. v. Arquette, 113 F. Supp. 2d 322, 323 (N.D.N.Y. 2000) ("Before reaching the merits of Plaintiffs' motion for a preliminary injunction the Court will consider whether it has subject matter jurisdiction to hear Plaintiffs' claims."); DiNapoli v. DiNapoli, No. 95 CIV. 7872 (SS), 1995 WL 555740, at *2 (S.D.N.Y. Sept. 19, 1995) (Sotomayor, J) ("Thus, according this *pro se* complaint the close and sympathetic reading to which it is entitled, . . . it reveals no basis for the exercise of subject matter jurisdiction over plaintiff's suit, which therefore must be dismissed . . . . Plaintiff's requests for a temporary restraining order and preliminary injunction are denied.").

Generally, "[w]here a challenge to jurisdiction is interposed on an application for a preliminary injunction '[t]he plaintiff is required to adequately establish that there is at least a reasonable probability of ultimate success upon the question of jurisdiction when the action is tried on the merits.'" Savoie v. Merchants Bank, 84 F.3d 52, 57 (2d Cir. 1996) (quoting Visual Sciences, Inc. v. Integrated Communications Inc., 660 F.2d 56, 59 (2d Cir. 1981)).

The complaint alleges that this Court has jurisdiction over the Plaintiff's claims under 28 U.S.C. § 1331 — which confers original subject matter jurisdiction over "civil actions arising under the Constitution, laws, or treaties of the United States," also known as "federal question jurisdiction" — because "[t]his action arises under the Anti-fraud provision of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)) and Securities and Exchange Commission Rule 10b-5 (17 C.F.R. § 240.10b-5)." (Compl., Dkt. No. 1, at ¶ 5.)  In addition, the complaint asserts that the Court has subject matter jurisdiction over this action on the basis of 15 U.S.C. § 78aa, which provides "exclusive" jurisdiction to federal district courts over suits brought to enforce violations of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78a, *et seq.*  (See id. at ¶ 5.)

The Defendants assert that this action does not arise under the "anti-fraud provision" of the Exchange Act or implicate 15 U.S.C. § 78aa because "the entire Complaint is based upon the breach of a written agreement," namely, the July 2015 SPA and Note.  (The Defs.' Opp'n Mem. of Law, Dkt. No. 23, at 2.)

In response, the Plaintiff contends that (i) it has sufficiently asserted a cause of action pursuant to section 10(b) of the Exchange Act and SEC Rule 10b-5, and therefore, the Court has federal subject matter jurisdiction over this action; and (ii) there is diversity of citizenship jurisdiction over the action pursuant to 28 U.S.C. § 1332(a), which confers on federal courts original subject matter jurisdiction over "all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different states[.]"  (See the Pl.'s Reply Mem. of Law, Dkt. No. 23, at 3.)  In turn, the Court will address each basis for jurisdiction.

### 1. Federal Question Jurisdiction

The complaint asserts seven causes of action against the Plaintiff for:  (i) breach of the July 2015 Note and SPA by "willfully and unlawfully refus[ing] to deliver the Conversion shares"; (ii) fraud in the inducement by making "fraudulent misrepresentations" in the "Notes and Agreements" that Endonovo "would not fail to comply with the conversion requirements of the Notes"; (iii) lost

profits in connection with the Defendants' alleged breaches of the July 2015 Note and SPA; (iv) litigation expenses in connection with the Defendants' alleged breaches of the July 2015 Note and SPA; (v) violation of Section 10(b) of the Exchange Act and Rule 10b-5; (vi) a mandatory injunction demanding that the Defendants "execute and deliver all documents necessary to complete the conversion process"; and (vii) intentional interference with contract against Collier for "intentionally and with malice aforethought caus[ing] [Endonovo] to breach its contractual agreement with [the Plaintiff]." (See Compl. at ¶¶ 13–61.)

Other than the Plaintiff's fifth cause of action for securities fraud under Section 10(b) of the Exchange Act and Rule 10b-5, the Plaintiff's other six causes of action are all state common law claims and remedies which revolve exclusively around the interpretation of the July 2015 SPA and Note and not the interpretation of the Exchange Act, or any other federal law. For that reason, these six common law causes of action do not "arise under" federal law for purposes of 28 U.S.C. § 1331. See Mallgren v. Motion Recruitment Partners Inc., No. 13-CV-1054 MKB, 2013 WL 1873304, at *3 (E.D.N.Y. May 2, 2013) ("All of Plaintiff's claims, including breach of contract, negligence, and fraudulent misrepresentation, sound in state law and do not provide a basis for exercising federal jurisdiction.").

Thus, the only remaining basis for federal question jurisdiction is the Plaintiff's fifth cause of action for securities fraud under Section 10(b) of the Exchange Act and Rule 10b-5. The Defendants assert that this claim is duplicative of the Plaintiff's breach of contract claims and therefore, does not state a claim under the Exchange Act.

Where, as here, a defendant challenges subject matter jurisdiction by attacking the sufficiency of a plaintiff's federal claims, the Second Circuit has stated that a plaintiff need only show that his or her "federal claim is colorable" in order for the Court to "properly assume[] jurisdiction over the subject matter of the suit." Savoie, 84 F.3d at 57. This is not a particularly difficult standard to meet: "[a] federal question claim should only be dismissed for lack of subject matter jurisdiction if it is 'so

insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy.'" Novikova v. IRS, No. 04-CV-5324 (DLI) (LB), 2007 WL 2891301, at *8 (E.D.N.Y. Sept. 28, 2007) (alteration added) (quoting Lehman v. Discovery Commc'ns, Inc., 217 F. Supp. 2d 342, 347 (E.D.N.Y. 2002)); see also Albert v. Blue Diamond Growers, No. CV 15 4087(VM), 2015 WL 9450579, at *3 (S.D.N.Y. Oct. 21, 2015) ("The preliminary showing that must be made by the plaintiff, however, is not meant to be overly burdensome, "allowing for subject matter jurisdiction so long as 'the federal claim is colorable.'") (quoting Cromer Fin. v. Berger, 137 F.Supp.2d 452, 467 (S.D.N.Y. 2001)).

However, even assuming all inferences in the Plaintiff's favor, the Court agrees with the Defendants that the Plaintiff's securities fraud claim is not colorable.

The Plaintiff's securities fraud claim is based on a theory that the Defendants engaged in market manipulation. The complaint alleges that "the Defendants . . . engaged in knowing manipulation and deceptive conduct by directly representing warranting that [Endonovo] and Collier would honor its obligations pursuant to the Notes, and Agreement when in truth and in fact they had no intention to do so." (Compl., Dkt. No. 1, at ¶ 41.)

Section 10(b) of the Exchange Act prohibits the use of "any manipulative or deceptive device or contrivance" in violation of the SEC's rules and regulations "in connection with the purchase or sale of any security." 15 U.S.C.A. § 78j(b). SEC Rule 10b-5 makes it unlawful "in connection with the purchase or sale of any security" for a person to (i) "employ any device, scheme, or artifice to defraud . . . to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading"; or (ii) "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. § 240.10b-5.

"'Section 10(b), in proscribing the use of a 'manipulative or deceptive device or contrivance,' prohibits not only material misstatements but also manipulative acts.'" Wilson v. Merrill Lynch & Co.,

671 F.3d 120, 129 (2d Cir. 2011) (quoting ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99

(2d Cir. 2007)). To state a claim for market manipulation, a plaintiff must allege:

> (1) manipulative acts; (2) damage (3) caused by reliance on an assumption of an
> efficient market free of manipulation; (4) scienter; (5) in connection with the purchase
> or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a
> national securities exchange.

Id. (quoting ATSI, 493 F.3d at 101).

With respect to the first element, "in order for market activity to be manipulative, that conduct

must involve misrepresentation or nondisclosure," Wilson, 671 F.3d at 130, as well as allegations of

"wash sales, matched orders, rigged prices, or some other manipulative act intended to mislead

investors by artificially affecting market activity," ATSI, 493 F.3d at 101 (emphasis added) (quoting

Santa Fe Indus. v. Green, 430 U.S. 462, 476–77, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977)).

"A claim of manipulation . . . can involve facts solely within the defendant's knowledge;

therefore, at the early stages of litigation, the plaintiff need not plead manipulation to the same degree

of specificity as a plain misrepresentation claim." ATSI Commc'ns, Inc., 493 F.3d at 102. However,

"a manipulation complaint must plead with particularity the nature, purpose, and effect of the

fraudulent conduct and the roles of the defendants." Id. "General allegations not tied to the defendants

or resting upon speculation are insufficient"; rather, "[t]his test will be satisfied if the complaint sets

forth, to the extent possible, 'what manipulative acts were performed, which defendants performed

them, when the manipulative acts were performed, and what effect the scheme had on the market for

the securities at issue.'" Id. (quoting Baxter v. A.R. Baron & Co., No. 94 CIV 3913(JGK), 1995 WL

600720, at *1 (S.D.N.Y. Oct. 12, 1995)).

The complaint does not point to any misrepresentations or omissions, nor any affirmative

deceptive acts — such as wash trades, matched trades, or phantom shares — that were intended to

mislead investors by artificially affecting market activity. The fact that the Defendants allegedly failed

to honor their obligations under the July 2015 Note and SPA does not plausibly give rise to an

inference that they were somehow intending to send a signal to the financial markets regarding Endonovo's common stock by doing so.

In its reply brief, the Plaintiff asserts that the Defendants refused to convert their debt under the Notes into common stock "to keep the price of the existing shares higher."  (The Pl.'s Reply Mem. of Law, Dkt. No. 25, at 2.)

However, there are no allegations supporting this theory in the complaint.  Even if there was such an allegation, the Plaintiff's threadbare statement does not make clear the circumstances of the Defendants' alleged manipulative acts — such as, which Defendants performed them; when the manipulative acts were performed; and what effect the scheme had on the market for the securities at issue.  Rather, the Plaintiff's allegations of market manipulation rely on abject speculation, which courts have repeatedly held cannot form the basis of a securities fraud claim under the Exchange Act and Rule 10b-5. See Taylor v. Westor Capital Grp., 943 F. Supp. 2d 397, 403-04 (S.D.N.Y. 2013) ("Moreover, even if Taylor could connect this scheme to his own purchase of securities, his allegations regarding short sales are far too unspecific to survive dismissal. The First Amended Complaint contains virtually no details about this alleged scheme: it is impossible to tell what manipulative acts were performed, who performed them, when they were performed, what securities were involved, and what effect this scheme had on the market for those securities."); In re UBS Auction Rate Sec. Litig., No. 08 CIV. 2967 (LMM), 2010 WL 2541166, at *19 (S.D.N.Y. June 10, 2010) (dismissing a market manipulation claim because "assuming arguendo that the allegations with respect to Defendants in the Amended Complaint identified conduct that can be considered manipulative or deceptive, the Court finds that Plaintiffs failed to set forth when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue[.]"); Cohen v. Stevanovich, 722 F. Supp. 2d 416, 424 (S.D.N.Y. 2010) ("Plaintiffs' broad and conclusory allegations of naked short selling do not state a claim for market manipulation. The AC contains no allegations of wash transactions, matched orders or other similar activity, and does not assert that the parties to the alleged short sales were anything

other than bona fide buyers and sellers trading at the reported price of the transaction. The fact that the seller was allegedly unable to deliver the security on the settlement date — three days after the transaction — does not transform that legitimate sale into unlawful market manipulation.").

The Plaintiff's market manipulation claim fails for the additional reason that the alleged fraudulent acts of the Defendants were not made "in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5. "[T]he Second Circuit has long recognized that 'Rule [10b–5] impose[s] liability for a proscribed act in connection with the purchase or sale of a security; it is not sufficient to allege that a defendant has committed a proscribed act in a transaction of which the pledge of a security is a part.'" Taylor, 943 F. Supp. 2d at 402 (quoting Chemical Bank v. Arthur Andersen & Co., 726 F.2d 930, 943 (2d Cir. 1984)).

Thus, courts have repeatedly dismissed claims where the alleged fraudulent acts had no impact on the Plaintiff's decision to purchase a defendant's securities. See, e.g., id. ("In this case, Taylor's allegations encompass behavior by the Westor Defendants that post-dates his decision to purchase any of the securities in the Account; notably, he does not allege that the Westor Defendants' behavior impacted any of his purchasing decisions. The crux of the alleged fraud appears to be that the Westor Defendants coveted the contents of the Account and thus froze it to create enough financial pressure on Taylor to sell at a steep discount. But even if true, this conduct does not amount to a federal securities claim."); Levitin v. PaineWebber, Inc., 933 F. Supp. 325, 329 (S.D.N.Y. 1996) aff'd, 159 F.3d 698 (2d Cir. 1998) ("[T]he alleged nondisclosure at issue in this case pertains not to the sale of the securities or the value of the securities themselves, but to the terms of the relationship between the broker and the customer. Accordingly, the alleged nondisclosure does not constitute securities fraud in violation of section 10(b) and Rule 10b–5."); Crummere v. Smith Barney, Harris Upham & Co., 624 F. Supp. 751, 755 (S.D.N.Y. 1985) ("To satisfy the purchase and sale requirements of rule 10b–5, there must be a causal connection between the misstatements or omissions and the plaintiff's purchases or sales, and there can be no such connection where the misstatement occurs after the purchase.").

Here, the Defendants' alleged fraudulent acts — namely, refusing to convert their debt under the Note into common stock — occurred after the Plaintiff sent the Defendants a Notice of Conversion on January 21, 2016 seeking to obtain the Defendants' common stock. Thus, there is no causal connection between the Defendants' alleged fraudulent acts and the Plaintiff's decision to purchase the Defendants' common stock. While the Plaintiff's allegations of the Defendants' alleged failure to honor their conversion obligations under the July 2015 Notes and SPA may provide a basis for a common law breach of contract claim, they fall well-short of providing a basis for a federal securities fraud claim. See Korff v. Bank Julius Baer & Co., No. 88 CIV. 4569 (MJL), 1990 WL 67771, at *3 (S.D.N.Y. May 14, 1990) ("Although plaintiffs' allegations may provide the basis for a claim of breach of fiduciary duty or breach of contract, they fall far short of providing the basis for a federal claim under § 10(b) or Rule 10b–5.")

In sum, the Court finds that the complaint fails to allege a colorable claim under the Exchange Act and Rule 10b-5, and therefore, has failed to show a reasonable probability that this action arises under federal law for purposes of conferring federal subject matter jurisdiction.

**2. Diversity of Citizenship Jurisdiction**

The complaint does not invoke diversity of citizenship as a basis for subject matter jurisdiction. However, at oral argument and in a subsequently filed legal memorandum, the Plaintiff for the first time contends that "it is absolutely clear (and not denied) that the Court has diversity jurisdiction." (The Pl.'s Reply Mem. of Law, Dkt. No. 25, at 2.)

For their part, the Defendants did not address diversity of citizenship at oral argument or in their opposition memoranda.

Where, as here, a plaintiff has failed to allege a "colorable" federal claim, the Plaintiff must show "at least a reasonable probability" that another basis for federal jurisdiction, such as diversity of citizenship, exists. See Savoie, 84 F.3d at 57 (quoting Visual Sciences, Inc., 660 F.2d at 59); see also Indus. Elecs. Corp. v. Cline, 330 F.2d 480, 482 (3d Cir. 1964) ("Where the challenge is interposed on

an application for a preliminary injunction, the plaintiff is required to adequately establish that there is at least a reasonable probability of ultimate success upon the question of jurisdiction when the action is tried on the merits.") (citation omitted); Weitzman v. Stein, No. 70 CIV. 4037, 1991 WL 220960, at *1 (S.D.N.Y. Oct. 17, 1991) (same), aff'd, 963 F.2d 1521 (2d Cir. 1992)

The Court finds that the Plaintiff has failed to meet its burden. As noted, 28 U.S.C. § 1332 confers original federal jurisdiction over "all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different states." 28 U.S.C. § 1332(a).

Relevant here, "[t]he citizenship requirement for diversity jurisdiction has been interpreted to mean complete diversity so that each plaintiff's citizenship must be different from the citizenship of each defendant." Briarpatch Ltd., L.P v. Phoenix Pictures, Inc., 373 F.3d 296, 302 (2d Cir. 2004); see also Caterpillar Inc. v. Lewis, 519 U.S. 61, 68, 117 S. Ct. 467, 472, 136 L. Ed. 2d 437 (1996) ("[T]his Court construed the original Judiciary Act's diversity provision to require complete diversity of citizenship.") (citing Strawbridge v. Curtiss, 3 Cranch 267, 2 L. Ed. 435 (1806)).

Here, the complaint alleges that the Plaintiff was a "corporation organized and existing under the laws of the State of New York with an office for business in the County of Nassau." (Compl. at ¶ 8.) In addition, the complaint alleges that the Defendant Endonovo "has been and remains a corporation organized and existing under the law of the State of Delaware, within an office for business in the State of California, County of Los Angeles."

For purposes of determining citizenship, "a corporation is considered a citizen of the state in which it is incorporated and the state of its principal place of business." Bayerische Landesbank, New York Branch v. Aladdin Capital Mgmt. LLC, 692 F.3d 42, 48 (2d Cir. 2012). Thus, construing the allegations in the complaint as true, the Plaintiff is a citizen of New York, and the Defendant Endonovo is a citizen of California and Delaware.

However, the citizenship of the Defendant Collier is less clear. "An individual's citizenship, within the meaning of the diversity statute, is determined by his domicile." Palazzo ex rel. Delmage v. Corio, 232 F.3d 38, 42 (2d Cir. 2000). "Domicile has been described as the place where a person has ''his true fixed home and principal establishment, and to which, whenever he is absent, he has the intention of returning.'" Linardos v. Fortuna, 157 F.3d 945, 948 (2d Cir. 1998) (quoting 13B C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3612, at 526 (2d ed. 1984)).

"[I]t is well-established that allegations of residency alone cannot establish citizenship[.]" Canedy v. Liberty Mut. Ins. Co., 126 F.3d 100, 103 (2d Cir. 1997). That is because unlike domicile, residency may or may not be permanent. For example, a person may have multiple residences but may only have one true domicile. See Kennedy v. Trustees of Testamentary Trust of Will of Kennedy, 633 F. Supp. 2d 77, 81 (S.D.N.Y. 2009), aff'd, 406 F. App'x 507 (2d Cir. 2010) ("Domicile is not synonymous with residence; a party can reside in one place and be domiciled in another.") (citing Mississippi Band of Choctaw Indians v. Holyfield, 490 U.S. 30, 47–49, 109 S.Ct. 1597, 104 L.Ed.2d 29 (1989)).

Thus, courts have repeatedly found that complaints failed to allege diversity of citizenship jurisdiction where the allegations focus solely on a party's residence. See Young-Gibson v. Patel, 476 F. App'x 482, 483 (2d Cir. 2012) (summary order) ("It is well-established that allegations of residency alone cannot establish whether parties are 'citizens of different states' for the purposes of establishing subject matter jurisdiction under section 1332 . . . . Although Patel does not press this issue, subject matter jurisdiction is a 'threshold question that must be resolved . . . before proceeding to the merits,' Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 88–89, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998), and we conclude that Young–Gibson has failed properly to allege diversity jurisdiction."); Davis v. Cannick, No. 14-CV-7571 (SJF)(SIL), 2015 WL 1954491, at *3 (E.D.N.Y. Apr. 29, 2015) (dismissing a complaint for lack of subject matter jurisdiction because "[t]he complaint is devoid of any facts regarding plaintiff's pre-incarceration domicile, or upon which it may reasonably be inferred that

plaintiff was a domiciliary or citizen of the State of Florida at the time he commenced this action.");

Vargas v. Pers., No. 13 CIV. 4699 (KBF), 2014 WL 1054021, at *3 (S.D.N.Y. Mar. 17, 2014) ("The

simple statement that he is a 'resident of the City of Kissimmee and State of Florida,' without a

showing of his intention to return to and remain in Florida, is insufficient. Given the evidence on this

motion, plaintiff's complaint does not raise the plausibility of diversity of citizenship here 'above the

speculative level.'") (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).

In the present case, the complaint states that "Collier has been and remains a resident of the

State of California, County of Los Angeles." (Compl. at ¶ 10.)  Even if true, this allegation is not

sufficient for the Court to infer that the Plaintiff is a California domicile and thereby a California

citizen.

The Plaintiff asserted at oral argument and in its legal memorandum that Collier is a California

citizen, and the Defendants do not appear to dispute that alleged fact.  However, without any

allegations in the complaint to substantiate the Plaintiff's assertion, nor any other evidence in the

record from which the Court might determine the Plaintiff's domicile, the Court declines to assume

that the Plaintiff is a California citizen, particularly when "it is well established that '[t]he party

seeking to invoke jurisdiction under 28 U.S.C. § 1332 bears the burden of demonstrating that the

grounds for diversity exist and that diversity is complete.'"  Herrick Co. v. SCS Commc'ns, Inc., 251

F.3d 315, 322-23 (2d Cir. 2001) (quoting Advani Enter., Inc. v. Underwriters at Lloyds, 140 F.3d 157,

160 (2d Cir. 1998)).

In sum, the Court finds that the Plaintiff failed to establish that the Court has subject matter

jurisdiction over this action, or a reasonable probability that such jurisdiction exists.  As such, the

Court denies the Plaintiff's motion for a preliminary injunction and *sua sponte* dismisses the complaint

without prejudice.  However, the Court grants the Plaintiff leave to file an amended complaint within

thirty days of the date of this Order from which the Court may ascertain whether it has subject matter

jurisdiction over this action.

**B. As to Irreparable Harm**

Even if there was subject matter jurisdiction over this action, the Court would still deny the Plaintiff's request for preliminary relief because it finds that the Plaintiff has not established irreparable harm.

"A showing of irreparable harm is 'the single most important prerequisite for the issuance of a preliminary injunction.'" Faiveley Transp. Malmo AB v. Wabtec Corp., 559 F.3d 110, 118 (2d Cir. 2009) (quoting Rodriguez v. DeBuono, 175 F.3d 227, 234 (2d Cir. 1999)). "To satisfy the irreparable harm requirement, Plaintiffs must demonstrate that absent a preliminary injunction they will suffer 'an injury that is neither remote nor speculative, but actual and imminent,' and one that cannot be remedied 'if a court waits until the end of trial to resolve the harm.'" Grand River Enter. Six Nations, Ltd. v. Pryor, 481 F.3d 60, 66 (2d Cir. 2007) (quoting Freedom Holdings, Inc. v. Spitzer, 408 F.3d 112, 114 (2d Cir. 2005)).

"As a general matter, because monetary injury can be estimated and compensated, the likelihood of such injury usually does not constitute irreparable harm." Brenntag Int'l Chemicals, Inc. v. Bank of India, 175 F.3d 245, 249 (2d Cir. 1999); see also Pivotal Payments, Inc. v. Phillips, No. CV 14-4910 (GRB), 2014 WL 6674621, at *3 (E.D.N.Y. Nov. 25, 2014) ("'If the injury complained of may be compensated by an award of monetary damages, then an adequate remedy at law exists and no irreparable harm may be found as a matter of law.'") (parenthetically quoting Gen. Textile Printing & Processing Corp. v. Expromtorg Int'l Corp., 862 F. Supp. 1070, 1075 (S.D.N.Y. 1994)).

In the present case, the Plaintiff's injuries arise from the Defendants' refusal to comply with the Plaintiff's January 21, 2016 election to "convert $15,000 of the $33,000 due under the July 2015 Note into 95,663 shares of common stock at the conversion price of $.1568 per share." (See Kramer Aff., Ex. G.)

The Note specifically provides monetary remedies in the event that Endonovo fails to comply with a valid notice of conversion received from the Plaintiff. Specifically, Article 1.4(e) provides that

in the event that Endonovo fails to deliver common stock to the Plaintiff within three business days of receipt of a notice of conversion, Endonovo "shall pay to the [Plaintiff] $2,000 per day in cash," which amount will be "added to the principal amount" of $33,000 due under the Note, plus interest. (See Kramer Aff., Ex. A, at Art. 1.4(e), at pp. 6–7.) In addition, Article III of the Note describes a failure by Endonovo to "issue shares of Common Stock to the [Plaintiff] . . . upon exercise by the [Plaintiffs] of the conversion rights of the [Plaintiff]" as a "default," which renders the Note immediately due and payable and provides for additional damages according to a specific formula provided for in Article III. (Id. at Arts. 3.2, 3.16, at pp. 14–15, 17.)

Based on these provisions, if as the Plaintiff alleges, the Defendants breached the terms of the July 2015 SPA and Note by failing to convert "$15,000 of the $33,000 due under the July 2015 Note into 95,663 shares of common stock," then the Note provides for an adequate remedy at law in the form of monetary damages.

The Plaintiff appears to concede this point but nevertheless asserts that it has established irreparable harm because (i) the Defendants are "on the brink of insolvency based upon the contents of the debtor's Form 10-K"; and (ii) Endonovo "consented in the governing instruments to a finding of irreparable harm and injunctive relief." (The Pl.'s Reply Mem. of Law, Dkt. No. 25, at 3–4.)

In response, the Defendants assert that (i) the Court lacks the authority to issue an injunction solely on the basis of insolvency; and (ii) Endonovo "has sufficient funds to pay this obligation if it is found to be legally valid and enforceable." (The Defs.' Opp'n Mem. of Law, Dkt. No. 23, at 3–4.) The Court agrees.

As to the Plaintiff's first contention — namely, that a defendant's pending insolvency can give rise to irreparable harm sufficient to justify a preliminary injunction— in Brenntag Int'l Chemicals, Inc. v. Bank of India, 175 F.3d 245, 249 (2d Cir. 1999), the Second Circuit stated:

> As a general matter, because monetary injury can be estimated and compensated, the likelihood of such injury usually does not constitute irreparable harm . . . . However, a perhaps more accurate description of the circumstances that constitute irreparable harm is that where, but for the grant of equitable relief, there is a substantial chance that upon

final resolution of the action the parties cannot be returned to the positions they previously occupied . . . . For this reason, courts have excepted from the general rule regarding monetary injury situations involving obligations owed by insolvents.

Id. (internal citations omitted) (emphasis added).

Subsequently, the United States Supreme Court in Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc., 527 U.S. 308, 308, 119 S. Ct. 1961, 1963, 144 L. Ed. 2d 319 (1999) appeared to cast doubt on the continued vitality of the broad exception for insolvency outlined in Brenntag.

In Grupo, investors who held notes in a Mexican company experiencing financial difficulties filed suit in federal court seeking breach of contract damages and requesting a preliminary injunction restraining the company from transferring its remaining assets to Mexican creditors. Id. at 312. The district court entered a preliminary injunction freezing the company's assets because (i) it found that the company was "at risk of insolvency" and planned to use its assets to satisfy Mexican creditors; (ii) as a result, the investors had demonstrated irreparable injury; and (iii) the investors were likely to succeed on the merits of their breach of contract claim. Id. at 312–13. The Second Circuit affirmed the decision.

In Grupo, the Supreme Court, with Justice Scalia writing for the majority, reversed. See id. at 333. Justice Scalia reasoned that federal courts derive their jurisdiction to issue preliminary injunctions on the basis of the Judiciary Act of 1789, which provides federal courts with the same "jurisdiction in equity exercised by the High Court of Chancery of England at the time of the adoption of the Constitution and the enactment of the original Judiciary Act, 1789." Id. at 318 (quoting A. Dobie, Handbook of Federal Jurisdiction and Procedure 660 (1928)). The United States as amicus curiae argued that the preliminary injunction issued by the district court was "analogous to the relief obtained in the equitable actions known as a 'creditor's bill.'" Id. at 319.

Justice Scalia rejected that argument, finding that "[i]t was well established, however, that, as a general rule, a creditor's bill could be brought only by a creditor who had already obtained a judgment

establishing the debt." Id. As preliminary relief was by necessity issued prior to a judgment, Justice

Scalia found that a preliminary relief in aid of a creditor was not available in equity:

> [A] general creditor (one without a judgment) had no cognizable interest, either at law
> or in equity, in the property of his debtor, and therefore could not interfere with the
> debtor's use of that property. As stated by Chancellor Kent: 'The reason of the rule
> seems to be, that until the creditor has established his title, he has no right to interfere,
> and it would lead to an unnecessary, and, perhaps, a fruitless and oppressive
> interruption of the exercise of the debtor's rights.'

Id. at 319–320 (quoting Wiggins v. Armstrong, 2 Johns. Ch. 144, 145–146 (N.Y. 1816)). He further

noted:

> [W]e suspect there is absolutely nothing new about debtors' trying to avoid paying their
> debts, or seeking to favor some creditors over others . . . . The law of fraudulent
> conveyances and bankruptcy was developed to prevent such conduct; an equitable
> power to restrict a debtor's use of his unencumbered property before judgment was not.

Id. at 322.

Justice Scalia further distinguished the present case from Deckert v. Independence Shares

Corp., 311 U.S. 282, 61 S.Ct. 229, 85 L.Ed. 189 (1940). In Deckert, the purchasers of stock

certificates asserted a claim under the Securities Act of 1933 against the company that sold the

certificates and the administrator of a trust holding the common stock, alleging that the sale of the

certificates was fraudulent and seeking equitable remedies of rescission and restitution. Id. at 285.

The plaintiffs also sought a preliminary injunction preventing the trust from transferring any assets

because the company was in danger of insolvency and was likely to transfer its assets to other

creditors. Id. at 285–286. After deciding that the complaint stated a cause of action for equitable relief

under the Securities Act, the Court concluded that "the injunction was a reasonable measure to

preserve the status quo pending final determination of the questions raised by the bill." Id. at 290.

The Majority in Grupo found Deckert to be "not on point" because Grupo involved a legal, not

equitable, breach of contract claim for monetary damages — "[t]he preliminary relief available in a

suit seeking equitable relief has nothing to do with the preliminary relief available in a creditor's bill

seeking equitable assistance in the collection of a legal debt." Grupo, 527 U.S. at 325. And, because a

preliminary injunction "was historically unavailable from a court of equity," the Court held "that the District Court had no authority to issue a preliminary injunction preventing petitioners from disposing of their assets pending adjudication of respondents' contract claim for money damages." Id. at 333.

The Second Circuit appears to not have had occasion to re-visit the "insolvency" exception outlined in Brenntag in light of the Supreme Court's decision in Grupo. However, other courts have interpreted Grupo to stand for the principle that courts cannot issue preliminary injunctions based solely on the insolvency of debtors where the plaintiffs' underlying claims primarily seek monetary damages. See U.S. ex rel. Rahman v. Oncology Associates, 198 F.3d 489, 496 (4th Cir. 1999) ("A debt claim leads only to a money judgment and does not in its own right constitute an interest in specific property. Accordingly, a debt claim does not, before reduction to judgment, authorize prejudgment execution against the debtor's assets."); Levy v. Young Adult Inst., Inc., No. 13-CV-2861 (JPO), 2015 WL 170442, at *6 (S.D.N.Y. Jan. 13, 2015) ("Lower courts have generally interpreted Grupo Mexicano to bar preliminary injunctions in cases that seek primarily legal remedies."); Oak Leaf Outdoors, Inc. v. Double Dragon Int'l, Inc., 812 F. Supp. 2d 944, 947 (C.D. Ill. 2011) ("As Grupo Mexicano makes clear, this Court does not have the authority to issue a preliminary injunction preventing Oak Leaf from disposing of its assets — in the form of a constructive trust, escrow, asset freeze, or some other similar relief — pending adjudication of DDI's contract claim for money damages."); JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc., 295 F. Supp. 2d 366, 389 (S.D.N.Y. 2003) ("Because the plaintiff's action is one for money damages, and because the plaintiff asserts no lien or equitable interest in the assets it seeks to restrain, this Court lacks the power to grant the preliminary injunction it seeks.").

On the other hand, courts have held that Grupo does not preclude a court from entering a preliminary injunction to protect the assets where the plaintiff's underlying claims are primarily equitable in nature. See Rahman, 198 F.3d at 497 ("[W]e must begin with an analysis of the claims in suit to determine whether they seek cognizable relief in equity involving assets of the defendant. We

then proceed to determine whether the interim relief sought — in this case the preliminary injunction freezing assets — is a reasonable measure to preserve the status quo in aid of the ultimate equitable relief claimed."); <u>Corp. Comm'n of Mille Lacs Band of Ojibwe Indians v. Money Centers of Am., Inc.</u>, 915 F. Supp. 2d 1059, 1063 (D. Minn. 2013) ("In the Court's view, the better reading of <u>Grupo Mexicano</u> and <u>Deckert</u> focuses on the essence of the action and the strength of the alleged equitable interest.").

      In the present case, the Plaintiff asserts legal claims — namely, breach of contract and tortious interference — and an equitable claim — namely, fraud in the inducement.  In addition, Plaintiff seeks monetary relief in the form of compensatory damages, lost profits, and litigation expenses, as well as equitable relief in the form of a permanent injunction directing the Defendants to comply with the Plaintiff's January 21, 2016 Notice of Conversion.

      However, the Court finds that although some of the Plaintiff's claims sound in equity, those claims are entirely duplicative of the Plaintiff's breach of contract claims.  Specifically, the parties' relationship is governed by the terms of the July 2015 Note and SPA, and the Defendants' alleged failure to submit to the Plaintiff's Notice of Conversion is a breach of those agreements.  The Plaintiff's entitlement to relief on both its contract and equitable claims is based on interpreting the Note and SPA and not based on the principles of equity, such an unjust enrichment.  Indeed, the Plaintiff's fraud in the inducement claim is based on alleged "fraudulent misrepresentation[s] of [Endonovo] and Collier <u>contained within the Notes and Agreements</u> and confirmed within resolutions of the Board of Directors of the Corporate Defendant including but not limited to the representations that [Endonovo] would not fail to comply with the conversion requirement of the Notes[.]"  (Compl., Dkt. No. 1, at ¶ 29.)  Thus, the essence of the Plaintiff's fraud claim is a breach of the Defendants' obligations under the July 2015 Note and SPA, not a breach of a fiduciary or other duty imposed outside the four corners of the parties' written contracts.

Furthermore, although the Plaintiff seeks equitable relief in the form of a preliminary injunction directing the Defendants to convert their debt into common stock, the Court finds, as discussed above, that the July 2015 SPA and Note provide the Plaintiff with an adequate legal remedy for the Defendants' refusal to convert their stock in the form of liquidated damages at the rate of $2,000 per day, an acceleration of the remaining indebtedness under the Note, and an additional "default sum" according to a formula outlined in Article III of the Note.

Under these circumstances, the Court finds that the Plaintiff's request for a preliminary injunction is made primarily to protect the Defendants' assets in the event it succeeds on its breach of contract claims for monetary damages, a result that is plainly prohibited by <u>Grupo</u>. <u>See Corp. Comm'n of Mille Lacs Band of Ojibwe Indians</u>, 915 F. Supp. 2d at 1064 ("The Court concludes that the 'principal objects' of this suit are money damages for a breach of contract, and therefore the requested injunction is barred by the Supreme Court's holding in <u>Grupo Mexicano</u>."); <u>Oak Leaf Outdoors, Inc.</u>, 812 F. Supp. 2d at 947 (denying a preliminary injunction because "DDI has failed to persuade the Court that it is pursuing equitable claims for relief as well as a legal claim for breach of contract"); <u>JSC Foreign Econ. Ass'n Technostroyexport</u>, 295 F. Supp. 2d at 389 (denying a plaintiff's request for a preliminary injunction because "[t]he equitable relief that the plaintiff seeks, including the setting aside of alleged fraudulent conveyances, is incidental to, and indeed contingent upon the success of, the plaintiff's alter ego action. Before the plaintiff can seek equitable relief in enforcing the prior judgment, it must prove the legal liability of Reich and Jossem as alter egos").

The Court is not persuaded by the Plaintiff's arguments to the contrary.

The Plaintiff cites to <u>Castle Creek Tech. Partners, LLC v. CellPoint Inc.</u>, No. 02 CIV. 6662 (GEL), 2002 WL 31958696, at *1 (S.D.N.Y. Dec. 9, 2002). In that case, the plaintiff-investor sought a preliminary injunction requiring the defendant to deliver shares of common stock pursuant to a convertible promissory note similar to the one at issue in this case. <u>Id.</u> at *1–3. Applying the rule in <u>Brenntag</u>, the court found irreparable harm because "the plaintiff provided ample and specific evidence

that CellPoint is at the brink of insolvency, and that by the conclusion of the litigation, CellPoint may be in no position to satisfy a money judgment or an injunction." Id. The Court does not find Castle Creek to be applicable here for several reasons.

First, Castle Creek is an unreported district court opinion that is not binding on this court, and it does not address Grupo and the subsequent decisions discussed above. Thus, to the extent Castle Creek is analogous, the Court respectfully declines to follow it. See Black Mountain Equities, Inc. v. Pac. Gold Corp., No. 2:12-CV-01285 (KM) (CLW), 2012 WL 5986488, at *12 (D.N.J. Nov. 27, 2012) (declining to follow unreported New York federal cases providing for preliminary relief in the event of insolvency because "[a] number of these cases were decided before Grupo Mexicano, and none of them mention Grupo Mexicano").

Second, the complaint in Castle Creek did not seek monetary relief but rather, a declaratory judgment as to the conversion price of the plaintiff's shares and a mandatory injunction. Thus, the sole basis for relief in Castle Creek was equitable in nature. Therefore, Grupo — which only precludes preliminary relief for claims seeking primarily monetary damages — arguably did not apply to the plaintiff's claims in Castle Creek.

Here, by contrast and as explained above, the complaint sounds primarily in breach of contract, and the Plaintiff has a perfectly adequate legal remedy in the form of monetary damages provided for in the July 2015 Note. Accordingly, Grupo is applicable to this case and precludes this Court from entering a preliminary injunction prior to a judgment on the Plaintiff's breach claims. See Black Mountain Equities, Inc., 2012 WL 5986488, at *11 ("Black Mountain's preliminary injunction motion, although couched in equitable terms, is more properly viewed as an attempt to secure a money judgment to which it may someday be entitled.").

Third, even to the extent that Castle Creek could be read as supporting a broad "insolvency exception" to the issue of irreparable harm in cases where monetary relief otherwise provides an adequate legal remedy, the facts of Castle Creek are clearly distinguishable. In Castle Creek, the

defendant had not only issued financial statements indicating that its continued solvency was a going

concern, but had also defaulted on its required interest payments twice, and its stock price was

"delisted" for a period of ten days. See id. at *1–2.

Here, to prove Endonovo's insolvency, the Plaintiff relies primarily on a Form 10-Q filed by

Endonovo with the SEC for the quarterly period ending on September 30, 2015. The 10-Q lists the

Plaintiff as having $61,755 in assets and $5,991,245 in total liabilities. (See Endonovo September 30,

2015 10-Q at 4.) In addition, the 10-Q states, "The Company is raising additional capital through debt

and equity securities in order to continue funding its operation. However, there is no assurance that the

Company can raise enough funds or generate sufficient revenues to pay its obligations as they become

due, which raises substantial doubt about our ability to continue as a going concern." (Id. at 8.)

However, the Defendants filed an affidavit by Collier and Frank J. Harriton, Esq., an attorney

for Endonovo who helped to draft the Plaintiff's 10-Q, disputing the import of the "going concern"

statements in their 10-Q. (See Harion Aff., Dkt. No. 24–2, at ¶¶ 3, 4; Collier Aff., Dkt. No. 24-1, at ¶¶

5–7.) More importantly, unlike the defendant-company in Castle Creek, Endonovo has not missed any

interest or principal payments. To the contrary, it paid off in full the $33,000 in principal and interest

due under the first promissory note despite having little operating income. (See Hariton Aff. at ¶ 4.)

Thus, there is reason to believe that despite the dire picture painted by the unaudited financial

statements in Endonovo's most recent 10-Q, Endonovo may have sufficient funds to pay the balance

on the July and August 2015 Notes, or any damages resulting from their alleged breaches.

Therefore, even if the insolvency exception outlined in Brenntag is still viable in a case such as

this, the Plaintiff has failed to provide "ample evidence" showing that the Defendants will be unable to

pay damages if the Plaintiff succeeds in its breach of contract claims. See Pivotal Payments, Inc. v.

Phillips, No. CV 14-4910 (GRB), 2014 WL 6674621, at *4 (E.D.N.Y. Nov. 25, 2014) ("In this

instance, CardFlex is not insolvent, and maintains that it remains 'an ongoing viable business.' . . . .

While the parties vigorously dispute the import of financial statements relating to CardFlex, plaintiff has failed to demonstrate that any 'risk of insolvency is likely and imminent.'").

The Plaintiff also relies on language in the July 2015 Note and SPA which it contends indicates that the Defendants consented to a preliminary injunction. (See the Pl.'s Reply Mem. of Law, Dkt. No. 25, at 4.) In particular, Article 5 of the July 2015 SPA, states that if Endonovo breaches its conversion obligations under the Note or the SPA, then:

> [Endonovo] acknowledges that the remedy at law for a breach of its obligations under this Section 5 may be inadequate and agrees, in the event of a breach or threatened breach by [Endonovo] of the provisions of this Section, that the [Plaintiff] shall be entitled, in addition to all other available remedies, to an injunction restraining any breach and requiring immediate transfer, without the necessity of showing economic loss and without any bond or other security being required.

(Id. at Art. 5, at pp. 15–16) (emphasis added).

However, "contractual language declaring money damages inadequate in the event of a breach does not control the question whether preliminary injunctive relief is appropriate." Baker's Aid, a Div. of M. Raubvogel Co. v. Hussmann Foodservice Co., 830 F.2d 13, 16 (2d Cir. 1987). Although, the Court may consider such language as a factor in the irreparable harm analysis, "the Court remains obliged to make an independent determination as to whether injunctive relief is appropriate." In re M.B. Int'l W.W.L., No. 12 CIV. 4945 (DLC), 2012 WL 3195761, at *12 (S.D.N.Y. Aug. 6, 2012); see also Ins. Co. of the State of Pennsylvania v. Lakeshore Toltest JV, LLC, No. 15 CIV. 1436 (ALC), 2015 WL 8488579, at *2 (S.D.N.Y. Nov. 30, 2015) (same); Firemen's Ins. Co. of Newark, New Jersey v. Keating, 753 F. Supp. 1146, 1154 (S.D.N.Y. 1990) ("[I]t is clear that the parties to a contract cannot, by including certain language in that contract, create a right to injunctive relief where it would otherwise be inappropriate.").

Here, the Court finds that the Plaintiff has not demonstrated irreparable harm sufficient to justify a preliminary injunction. Thus, although the contractual language in the SPA providing for preliminary relief is relevant to the question of irreparable harm, it is not dispositive of the Court's analysis.

Accordingly, the Court finds that even if it had jurisdiction over this action, the Plaintiff's motion for a preliminary injunction would fail because it does not adequately demonstrate irreparable harm.

## III. CONCLUSION

For the foregoing reasons, the Court denies the Plaintiff's motion for preliminary injunction. The Court further dismisses the Plaintiff's complaint without prejudice and with leave to renew within thirty days of the date of this Order so as to cure the jurisdictional deficiencies identified by the Court.

**SO ORDERED.**

Dated: Central Islip, New York
March 1, 2016

*/s/ Arthur D. Spatt__*
ARTHUR D. SPATT
United States District Judge
